**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  2:05-cr-00153-BES-GWF |
| | ) | |
| vs. | ) | **FINDINGS & RECOMMENDATIONS** |
| | ) | |
| RICARDO SALINAS, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant's Motion to Suppress for Violation of Fourth Amendment (#13), filed on September 19, 2005 and the Government's Response to Defendant's Motion To Suppress Evidence Resulting From On-Street Stop of Defendant (#15), filed on September 27, 2005.  The Court conducted an evidentiary hearing in this matter on February 1, 2006.

The circumstances leading to Defendant Ricardo Salinas' arrest allegedly began as a consensual encounter between the Defendant and a Las Vegas Metropolitan Police detective, Robert Kinch, who desired to question Defendant about possible gang involvement.  Upon making contact with the Defendant, Detective Kinch observed a six-inch ice pick in Defendant's breast pocket which the detective considered a dangerous weapon and removed.  Detective Kinch then attempted to take hold of Defendant to conduct a pat-down search for other weapons.  The Defendant resisted and fled from the officers.  As the Defendant was fleeing, Detective Kinch allegedly observed the handgrip of a firearm partially protruding from Defendant's overalls.  Defendant hid in a nearby apartment, where he was subsequently found and arrested.  After being advised of his Miranda rights, Defendant told the

police where the firearm, a sawed-off shotgun, was located in the apartment and it was retrieved by the police officers. Defendant was subsequently indicted for felon in possession of a firearm. Defendant argues that his detention and the Detective Kinch's attempt to search him violated the Fourth Amendment. Defendant, therefore, moves to suppress the evidence of the firearm and the statements he made following his arrest as fruits of the poisonous tree.

## FACTS

Detective Robert Kinch was the sole witness to testify at the evidentiary hearing. He has been employed as a police officer by the Las Vegas Metropolitan Police Department ("Metro") for 13 years. During the past 2 years, he has been assigned to Metro's gang enforcement and suppression unit.

Detective Kinch testified that in the early 1990's, prior to his employment by Metro, he worked briefly as a private security guard at the Sierra Point Apartments located in the area of the Sierra Vista and Cambridge streets in Las Vegas, Nevada. He, therefore, indicated that he has long been acquainted with that property and neighborhood both before and during his career with Metro. Detective Kinch testified that the Sierra Point Apartments are public housing. He testified that these apartments and the immediate surrounding area have been extremely busy with gang-related crimes including numerous homicides and illegal shootings. The area is known to be frequented by armed gang members and persons trafficking street narcotics. According to Detective Kinch, the public alley which runs between Cambridge and Lisbon streets is colloquially referred to as "Crack Alley" and is an "open market" where illegal drugs are sold. There had been a recent homicide at the Sierra Point Apartment complex prior to the subject incident.

Detective Kinch testified that the gangs that congregate in the area of the Sierra Point Apartments are African-American gangs. Gangs composed of persons of Hispanic descent do not generally congregate in that area.

Detective Kinch testified that on January 16, 2005, at approximately 5:22 p.m., he and Detective Yannis were conducting routine gang enforcement and suppression patrol in the vicinity of the Sierra Point Apartments in an unmarked police sedan. Detective Yannis was driving and Detective Kinch was the passenger. The detectives were dressed in standard Metro police uniforms. The Government and Defendant stipulated that on January 16, 2005, the official high temperature in Las

Vegas was 63 degrees and the official low temperature was 41 degrees. There was no testimony regarding the actual temperature at around 5:20-5:30 p.m. which was after sundown. Detective Kinch testified that it was dark, but the temperature was not particularly cold, and he did not feel the need to wear a jacket.

Detective Kinch testified that as the detectives pulled into the alley they observed several African-American males in the vicinity. These individuals were dressed in dark or black baggy pants and pull-over, hooded sweat shirts consistent with the attire of the African-American gangs that frequent the area. Shortly after pulling into the alley, the detectives' attention was drawn to Defendant Salinas who was walking close to one of the buildings on the east side of the alley in the general direction of the African-American males the officers had observed. Defendant Salinas was wearing a long black leather coat,[1] bib-overalls and a tee-shirt. Detective Kinch testified that Defendant Salinas caught the detectives' attention because his style of dress, the bib-overalls and the coat, were not consistent with the style of dress of persons in that area. Defendant appeared to be a Hispanic male, his head was shaved, and he was wearing sunglasses on top of his head, which Detective Kinch stated are consistent with the appearance of Hispanic gang members. Detective Kinch suspected that Defendant might be a Hispanic gang member or associate and decided to approach him and ask him questions regarding his identity and to determine possible gang association. Detective Kinch testified that he suspected that Defendant might be armed, given the coat he was wearing could conceal the presence of a weapon. He wanted to deter any possible violence between Defendant and the African-American gang members in the area.

Detective Kinch also testified that in addition to wanting to find out if Defendant was a gang member, he wanted to inquire whether he was a resident at the Sierra Point Apartments and, if not, to possibly trespass him from the property. Detective Kinch testified that under an agreement with the

---

[1] In his arrest reports and hearing testimony, Detective Kinch described the Defendant's coat as a "trenchcoat." Defendant disputes that the coat could be properly characterized as a "trenchcoat," which by common understanding is a coat whose length reaches to or below the knees. A photograph of the coat worn by Defendant was admitted into evidence and it appears to be a hip or thigh length black leather jacket and is, therefore, not a trenchcoat as that term is commonly understood.

Sierra Point Apartments, Metro is granted authority to trespass non-residents from the property. He testified that "No Trespassing" signs are posted in the area.

Detective Kinch testified that upon exiting his vehicle, he approached Defendant Salinas and asked Defendant if he could speak with him. At this point, Detective Kinch testified that he was approximately 15 feet from Defendant and was closing the distance as he approached him. Defendant Salinas responded to the detective by asking "What did I do wrong?" Detective Kinch testified that he told the Defendant that he had done nothing wrong and that the officers just wanted to talk to him. Detective Kinch testified that neither he nor Detective Yannis had their guns drawn and they had not taken any measures to block or to restrict Defendant's liberty or freedom of movement.

Detective Kinch testified that as he moved closer to the Defendant, he "keyed-in" on Defendant's hands and body looking for possible weapons that might threaten the officers' safety. Detective Kinch testified that he observed a shiny metal object protruding slightly out of the chest pocket of Defendant's bib-overalls.[2] Detective Kinch testified that the object appeared to possibly be an ice pick. Detective Kinch pulled the object out of Defendant's chest pocket and confirmed that it was an ice pick.

Upon removing the ice pick from Defendant, Detective Kinch testified that he placed his hand on Defendant's arm and attempted to move him into a position where he could perform a pat-down search of Defendant's body to check for the presence of other weapons. Defendant backed away from the detective and spread his legs a little bit and took an aggressive stance which Detective Kinch

---

[2] In his arrest report, Detective Kinch also stated that as he approached Defendant, he observed numerous tattoos around Defendant's neck and chest area which was also consistent with Latin gang members and their style of tattooing. During the hearing, Defendant introduced the booking photographs and photographs taken of Defendant following his arrest. Tattoos are not visible on Defendant's neck in the booking photographs. It cannot be determined from these photographs whether tattoos are absent or simply are not visible because of the photographic lighting. In one of the photographs, Plaintiff's Exhibit "A", a portion of a tattoo appears to be visible just above the collar of Defendant's tee-shirt on the left front side of his lower neck/upper chest. The extent to which this tattoo was visible at the time Detective Kinch confronted Defendant on January 16, 2005 is open to question. Based on the photographs, the statement in Detective Kinch's report that he observed numerous tattoos around Defendant's neck and chest area appears to be an overstatement.

described as a "fight or flight" posture. At that point, a struggle ensued between Detective Kinch and the Defendant. Detective Kinch testified that he attempted to gain physical control over the Defendant by placing him in an "arm-lock." Detective Kinch instructed Defendant to give him his hands and stay put and not move. Instead of obeying the officer's commands, Defendant resisted the officer's attempt to subdue him in an apparent attempt to flee.

    Detective Kinch testified that he grabbed onto the sleeve of Defendant's coat and attempted to gain control of his other arm in order to subdue him. Detective Kinch drew his taser weapon and instructed Defendant to cease his resistance, and twice told him he would "tase" him if he did not stop resisting. According to Detective Kinch, Defendant continued to resist, so the officer shot the taser darts into Defendant's abdomen. The taser did not subdue the Defendant. During this struggle, Defendant's coat came off, and Defendant broke free from the officer and ran away.

    Once Defendant's coat came off and he began to flee, Detective Kinch saw the butt-end or hand grip of what appeared to be a large-frame revolver protruding from Defendant's bib-overalls. Upon observing the gun, Detective Kinch and Detective Yannis took defensive positions in case the Defendant pulled the gun and fired at them. Defendant ran around the corner of a building and Detective Kinch lost sight of him. Detective Kinch was able to determine that Defendant had not left the apartment complex. Shortly thereafter, a woman who appeared to be visibly upset came out of one of the apartment buildings and told the officers that Defendant was in the apartment unit she had just exited. The police set up a cordon around the building and complex. Defendant was subsequently found in the apartment unit identified by the woman at which time he surrendered and was placed under arrest. After reportedly being informed of his Miranda rights, Defendant informed the officers where the weapon, a sawed-off shot gun, was located inside the apartment. The weapon was located and secured.

    On May 11, 2005, Defendant was indicted in the United States District Court for the District of Nevada for Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1) and Possession of an Unregistered Firearm in violation of 26 U.S.C. § 5861.

. . .

. . .

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." *Id.* Evidence obtained in violation of the Fourth Amendment, and evidence derived from it, may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

The Supreme Court's Fourth Amendment case law instructs that in determining whether an officer's encounter with an individual violated his right to be free from unreasonable searches and seizures, the court must consider the totality of the circumstances. The Supreme Court has stated that probable cause is "a fluid concept turning on the assessment of probabilities and the particular factual context not readily, or even usefully, reduced to a neat set of legal rules," and its existence must be determined by an analysis of the totality of the circumstances surrounding the intrusion. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause does not deal with hard certainties, but with probabilities. *Id.* at 241.

Under the Fourth Amendment, law enforcement officers are authorized to briefly detain an individual and perform a limited "pat-down" search of his person for the presence of weapons, where the officer has reasonable suspicion that the person is engaged in or about to engage in criminal activity or is armed – thereby posing a danger to the safety of the officer. *Terry v. Ohio*, 392 U.S.1, 88 S.Ct. 1868 (1968). Under *Terry* and its progeny, an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot. *Terry*, *supra*, 392 U.S., at 30. While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimum level of objective justification for making the stop. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989). The officer must be able to articulate more than an "inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123, 124, 120 S.Ct. 673 (2000). The same totality of the circumstances test applies to investigatory stops made upon reasonable suspicion. *United States v. Arviso*, 534 U.S. 266,

1  273-274, 122 S.Ct. 744 (2002).  As *Arviso* instructs, the particular objective facts on which an officer
2  based his suspicions must be viewed in their totality, as to whether they contribute to a finding that
3  reasonable suspicion existed.  Conduct or behavior that might be viewed as innocent or innocuous in
4  one set of circumstances may be suspicious in the context of other circumstances.

5  Even in the absence of probable cause or reasonable suspicion, the Fourth Amendment does not
6  prohibit an officer from approaching an individual and attempting to ask him a few questions.  *Florida*
7  *v. Bostick,* 501 U.S. 429, 435, 111 S.Ct. 2382 (1991).  So long as a reasonable person would feel free
8  to disregard the police and go about his business, the encounter is consensual and no reasonable
9  suspicion is required. *Id. Bostick* states: "Only when the officer, by means of physical force or show
10 of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has
11 occurred." *Id.*  Questioning by law enforcement officers constitutes a detention or seizure only if in
12 view of all the circumstances surrounding the incident, a reasonable person would have believed that he
13 was not free to leave. *Desyllas v. Bernstine*, 351 F.3d 934, 940 (9th Cir. 2003), *quoting United Sates v.*
14 *Kim,* 25 F3d 1426, 1430 (9th Cir. 1994).

15 In *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004), *quoting Orhorhaghe v.*
16 *INS,* 38 F.3d 488, 494 (9th Cir. 1994), the court listed five factors which courts should consider in
17 deciding whether an encounter was consensual or the individual was seized:  (1) the number of officers;
18 (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public
19 setting; (4) whether the officer's officious or authoritative manner would imply that compliance would
20 be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter.

21 Within the foregoing framework, this Court turns to an examination of the facts and
22 circumstances in this case.  Detective Kinch's testimony indicates that based on his training and
23 experience as a member of the Metropolitan Police Department's gang suppression unit, he is familiar
24 the physical characteristics and attire of gang members or associates in the areas he patrols.  He was
25 also familiar with the Sierra Point Apartments and its surrounding area; that it is an area in which there
26 is a high level of illegal drug trafficking and violent crime, including numerous homicides and illegal
27 shootings, and that it is frequented primarily by African-American gang members, many of whom are
28 armed.

1  "An individual's presence in an area of expected criminal activity, standing alone, is not enough
2  to support a reasonable suspicion that the person is committing a crime." *Illinois v. Wardlow*, *supra*,
3  528 U.S., at 124, *citing Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637 (1979).  In *United States v. Davis*,
4  94 F.3d 1465 (10th Cir. 1996), for example, the court held that officers did not have reasonable
5  suspicion to justify a *Terry* stop and pat-down search of the defendant based solely on the facts that he
6  was a known ex-convict, was in a high crime area, and was approaching a bar where both legal and
7  illegal activity (unlicensed sales of liquor) occurred.  Officers, however, are not required to ignore the
8  relevant characteristics of a location in determining whether the circumstances are sufficiently
9  suspicious to warrant further investigation.  The fact that a stop occurred in a "high crime area" is
10 among the relevant contextual considerations in a *Terry* analysis.  *Wardlow, supra, citing Adams v.
11 Williams*, 407 U.S. 143, 144, 147-148, 92 S.Ct. 1921 (1972).

12  Upon pulling into the alley adjacent to the Sierra Point Apartments, the detectives observed
13 several African-American males whose attire was consistent with that worn by members or associates
14 of African-American gangs known by the officers to frequent that area.  The officers also observed the
15 Defendant, whose Hispanic ethnicity, physical characteristics, and attire (shaved head and sunglasses)
16 was consistent with that of Hispanic or Latin gang members or associates.  Defendant's possible
17 association with a Hispanic or Latin gang was arguably further indicated by Detective Kinch's later
18 observation of tattoos on Defendant's neck and chest, although the detective's statements in his reports
19 regarding the presence of those tattoos may be exaggerated in view of what is depicted in the
20 photographs.  Detective Kinch testified that Defendant attracted the officer's attention because it was
21 unusual for Hispanic gang members or associates to be in that area.  Defendant Salinas' presence in the
22 vicinity of African-American gang members raised a concern on the part of Detective Kinch for
23 potential violence between Defendant and the other individuals.

24  Besides Defendant's physical appearance which indicated possible gang association, Detective
25 Kinch testified that he suspected that Defendant might be armed because he was wearing a long black
26 leather coat which could conceal a weapon beneath it.  Given the time of year, the time of day, and the
27 probable temperature, however, the fact that Defendant was wearing a black leather coat was not in and
28 of itself, reasonably suspicious for criminal activity or that the Defendant was armed. The most that can

be drawn from the evidence is that the detective might suspect that Defendant was concealing a weapon under his coat.

Although no particular justification is required for an officer to approach and ask an individual questions, *Florida v. Bostick, supra,* the officers had reasonable grounds to initiate consensual contact with Defendant to make inquiries regarding who he was and his reason or purpose for being in the area. Detective Kinch also had at least some basis to be concerned that Defendant might be armed. Contrary to the defense's suggestion, it does not appear that the officers randomly selected Defendant for questioning solely because he was of Hispanic origin.

According to Detective Kinch's testimony, Defendant appeared reluctant or defensive about speaking with the officers. Defendant, of course, was not obligated to speak with the officers. *Bostick, supra.* Absent some additional fact or circumstance, if Defendant had responded to Detective Kinch by stating that he did not want to talk to him and proceeded to walk on, Detective Kinch would not have had lawful grounds to stop him. Defendant, however, did not walk on and instead paused to speak with the officer. Detective Kinch's testimony indicates that he was the only officer who initially approached the Defendant, and he merely asked him if he could ask him some questions. The other officer, Detective Yannis, appears to have still been near the police sedan. Detective Kinch testified that neither he nor Detective Yannis had drawn their weapons. There is no evidence at this point in the encounter that Defendant's freedom or liberty of movement had been restrained under the factors cited in *United States v. Washington*, *supra,* and *Orhorhaghe v. INS, supra.*

Detective Kinch testified that upon moving within a couple feet of Defendant Salinas, he observed the top of a six inch metal object sticking out of Defendant's front breast pocket which appeared to be an ice pick. Detective Kinch removed the object from Defendant's pocket and confirmed that it was an ice pick. The Government argues that upon observing and removing the ice pick from Defendant's pocket, which was in "plain view," Detective Kinch had either probable cause to arrest Defendant for carrying a concealed weapon, the ice pick, or to briefly detain Defendant and perform a "pat-down" search for the presence of other weapons.

NRS 202.350.1(d) makes it a crime for a person to carry concealed upon his person any (2) dirk, dagger or machete or (3) pistol, revolver or other firearm, or other dangerous or deadly weapon.

NRS 202.350.7(a) defines "concealed weapon" as a weapon described in the statute "that is carried upon a person in such a manner as not to be observable by ordinary observation."

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). To establish a "plain view" exception to a warrantless search (1) the initial intrusion must be lawful and (2) the incriminatory nature of the evidence must be immediately apparent. *United States v. Hudson*, 100 F.3d 1409, 1420 (9th Cir. 1996). A weapon may be concealed from ordinary observation for purposes of violating the concealed weapons statute and at the same time be within "plain view" of a police officer for purposes of justifying a seizure under the Fourth Amendment. The Supreme Court of Delaware in *Robertson v. State*, 704 A.2d 267, 268 (Del. 1997), states in this regard as follows:

> Courts in a majority of other jurisdictions have held that concealment means hidden from "ordinary observation." We adopt the majority rule requiring that a concealed weapon be "hidden from the ordinary sight of another person . . . [meaning] the casual and ordinary observation of another in the normal association of life." It is important to note, however, that courts in other states have typically distinguished "ordinary observation" from the observations of an investigating police officer. We approve that distinction and hold that a weapon may be concealed even though easily discoverable through routine police investigative techniques.
>
> "Plain view" for purposes of search and seizure law, is a broad concept. An item is in plain view not merely when it is ordinarily observable by the average person, but also when it is discoverable by police officers in the normal course of their investigative duties. We have held that an item is in plain view even though the police discovered it only by shining flashlights into areas not accessible by ordinary observation. The plain view doctrine thus is not inconsistent with concealment from ordinary observation because the latter does not incorporate an investigating officer's range of perceptions.

In *United States v. Thornton*, 710 F.2d 513 (9th Cir. 1983), a police officer approached a vehicle parked neared an intersection partially in the traffic lane with its lights on. The officer observed the defendant sitting behind the wheel, apparently asleep or unconscious. The officer also observed a gun stock partly protruding from underneath the front seat near defendant's leg. The defendant was subsequently removed from the vehicle and a shot gun was recovered. Defendant was charged with carrying a concealed weapon under the Idaho concealed weapons statute. The defendant argued that the officer's statement that the gun stock was in "plain view" precluded a finding that probable cause

1  existed under the concealed weapons statute.  The court held that under the Idaho statute the gun could
2  be considered concealed from ordinary observation when only part of the gun stock is visible.  In
3  affirming the trial court's decision that the officer had probable cause, *Thornton* also stated:

> The court found also that enough of the stock was visible to warrant [officer] Cobley's belief that a weapon was present.  An officer's experience may be considered in determining probable cause.  *United States v. Bernard*, 607 F.2d 1257 at 1266-67 (9th Cir. 1979).  The court's finding that Cobley, on seeing the gun stock, had probable cause to believe that the Idaho concealed weapons law was being violated was not clearly erroneous.

8  In *People v. Hernandez-Garcia*, 701 N.W.2d 191, 195 (Mich. App. 2005), the court held that
9  defendant could be convicted for carrying a concealed weapon where a pistol was partially concealed in
10  his waist band.  In *United States v. Robson*, 391 F.Supp.2d 383 (D. Md. 2005), the court held that
11  there was an issue of fact for trial whether a machete in a sheath sitting on the front seat of defendant's
12  tractor trailer was concealed.  The court noted, however, a prior Maryland state court decision, *Crosby*
13  *v. State*, 236 A.2d 33 (1967), in which the court held that a defendant who was wearing an open jacket
14  and had a hand gun stuck in the front waist band of his pants, was guilty of carrying a concealed
15  weapon.  The definition of "concealed weapon" in NRS 202.350.7(a) is consistent with the majority
16  rule that a weapon is concealed when it is not visible by ordinary observation and, yet, is within plain
17  view of an investigating officer.

18  Based on Detective Kinch's testimony, it appears that the ice pick in Defendant's chest pocket
19  was  concealed within the meaning of  NRS 202.350.7(a), but that it was also within the plain view of
20  Detective Kinch as he stood immediately in front of the Defendant and inspected his person for the
21  presence of weapons.

22  The other issue pertaining to the discovery of the ice pick is whether it is a weapon within the
23  meaning of the concealed weapons statute.  The statute lists certain specific types of weapons which it
24  is unlawful for a person to conceal on his or her person, i.e., a dirk, dagger or machete, NRS
25  202.350.1(d)(2); a pistol, revolver or other firearm, or other dangerous or deadly weapon, NRS
26  202.350.1(d)(3) or; a knife which is made an integral part of a belt buckle, NRS 202.350.1(d)(4).  The
27  Government argues that the ice pick is a "dangerous or deadly weapon" within the meaning of
28  202.350.1(d)(3).

The California Supreme Court has held that California's concealed weapons statute is a general intent crime in that the mere concealed possession of a weapon as defined by the statute is a crime. The state is not required to prove that the defendant had the specific intent to use the weapon for a criminal purpose. *See People v. Rubalcava*, 23 Cal.4th 322, 96 Cal.Rptr.2d 735,740-41 (2000). Although proof that the defendant intended to use the weapon for criminal purposes is not required, the surrounding circumstances may be relevant to the determination of whether the item was a weapon and was concealed on defendant's person. *Id.* In *Bradvica v. State*, 104 Nev. 476, 760 P.2d 139 (1988), the Nevada Supreme Court appeared to also interpret a former version of NRS 202.350.1 as a general intent crime. The court noted that "[t]his statute prohibits the mere concealed possession of a 'dangerous knife' without regard to the circumstances in which the knife was being used." *Id.,* 104 Nev., at 477.

In *Bradvica*, the defendant was convicted under the statute for carrying a small pocket knife. In reversing defendant's conviction, the court noted that the California Supreme Court had held that an ordinary pocket knife is not a dirk or dagger as a matter of law. In determining whether a weapon qualifies as a dirk or dagger, relevant factors to be considered are handguards and a blade which locks in place. *Id.,* 104 Nev., at 477 *citing People v. Bain*, 489 P.2d 564 (Cal. 1971). In concluding that the pocket knife was not a dirk or dagger, the court stated:

> Although the blade of Bradvica's knife would lock into place, it had no handguards that would enable the user to stab without substantial risk to his hand. Other than the fact that the blade locks into an open position, this knife no more resembles a dagger or stabbing weapon than a penknife carried by a Boy Scout.

*Id.*

The court in *Bradvica* also held that the term "dangerous knife" was so clearly vague that individuals must guess at its meaning without any objective, guiding factors and that such a term could not support the imposition of criminal liability. *Id.*

In *Huebner v. State*, 103 Nev. 29, 731 P.2d 1330 (1987), discussed in *Bradvica*, *supra,* the Nevada Supreme Court indicated however, that a "spring-loaded pointed implement designed for stabbing that was cleverly concealed within the shell of what appeared to be a ballpoint pen" could be considered a dagger within the meaning of the statute. The court noted that a dagger "is a short

weapon used for thrusting and stabbing and that stabbing is using a pointed weapon to wound or kill. *Id.* 103 Nev., at 30, n.1, *citing The Oxford Dictionary of English Etymology* (1983).

An ice pick is defined as a hand tool ending in a spike for chipping ice. *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2003). By its design, an ice pick is a stabbing or thrusting implement, albeit with a legitimate function – chipping or breaking ice. It can, however, be used in the same manner as a dagger. In *People v. Robert L.*, 112 Cal.App.3d 401, 404, 169 Cal.Rptr. 354, 355-56 (1980), the court held that an ice pick was within the scope of a statute making it a crime to carry a concealed dirk or dagger. In so holding, the court stated that the legislature "sought to outlaw the classic instruments of violence and their homemade equivalents." The court also stated that the legislature "sought likewise to outlaw possession of the sometimes-useful object when the attendant circumstances, including time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicate the possessor would use the object for a dangerous, not harmless, purpose." The court held that the statute embraces instruments other than those specifically created or manufactured for criminal purposes. The Court is satisfied that an ice pick qualifies as a dagger within the meaning of NRS 202.350.1(d)(2).

The Court is also satisfied that an ice pick is "a dangerous or deadly weapon" within the meaning of NRS 202.350.1(d)(3). Courts have stated that the term "dangerous weapon" as used in contexts other than concealed weapons statutes means any weapon that taking into account the manner in which it is used is likely to produce death or great bodily harm. *United States v. Robinson*, 29 F.3d 878, 885-886 (3rd Cir. 1994), *citing State v. Smith*, 573 So.2d 306, 310 (Fla. 1990); *Ayers v. State*, 60 Miss 709,713 (1883). The Third Circuit citing Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* (1972), also stated:

> A deadly weapon is one which, from the manner used, is calculated or likely to produce death or serious bodily injury. Thus whether a weapon is deadly depends on two factors: (1) what it intrinsically is and (2) how it is used. If almost anyone can kill with it, it is a deadly weapon when used in a manner calculated to kill. Thus the following weapons have been held to be deadly weapons in view of the circumstances of their use: . . . iron bars, baseball bats, bricks, rocks, ice picks, automobiles, and pistols used as bludgeons.

*Id.*

1    Defendant Salinas was in possession of a concealed six inch ice pick while standing in an alley
2 near an apartment complex.  Upon observing what appeared to be an ice pick partially sticking out of
3 Defendant Salinas' chest pocket, Detective Kinch had probable cause to seize it as a concealed weapon
4 in "plain view" and to proceed to place the Defendant under arrest for violation of NRS 202.350.1(d).
5 Because the facts and circumstances support a conclusion that Detective Kinch had probable cause to
6 arrest Defendant upon discovery of the ice pick, he could at that point have conducted a search incident
7 to arrest.  *Chimel v. California,* 395 U.S. 752, 762-63, 89 S.Ct. 2034 (1969); *Thornton v. United*
8 *States*, 541 U.S. 615, 124 S.Ct. 2127, 2132 (2004); *United States v. Kincade*, 379 F.3d 813, 822
9 (2004); *United States v. Osife*, 398 F.3d 1143, 1145 (9th Cir. 2005).

10    Detective Kinch testified that his intention upon discovering the ice pick was to physically detain
11 Defendant Salinas and conduct a pat-down search of his person for the presence of other weapons.
12 According to Detective Kinch, his training indicated to him that where a person has one weapon on
13 him, there is probability that he possesses other weapons.  Although the circumstances prior to the
14 discovery of the ice pick may not have been sufficient to conduct a *Terry* stop, that discovery standing
15 alone, and certainly in combination with the other circumstances observed by the officer, constituted
16 reasonable suspicion that Defendant was engaged in or about to engage in criminal activity or was
17 armed, thereby justifying Detective Kinch's attempt to conduct a precautionary pat-down search of the
18 Defendant.  Furthermore, because Detective Kinch had probable cause upon discovery of the ice pick
19 to arrest Defendant and conduct a search incident to arrest, he also had reasonable grounds to detain
20 the Defendant and perform a *Terry* "pat-down" search for the presence of other weapons.

21    The ensuing events obviously justified Detective Kinch's attempt to gain physical control over
22 the Defendant.  Defendant physically resisted the officer's lawful attempt to restrain him and perform a
23 pat-down search.  *See Illinois v. Wardlow supra,* 528 U.S., at 124 (officers had reasonable suspicion
24 that defendant was engaged in criminal activity when he fled upon approach of officers.)

## CONCLUSION

26    The Court finds that Detective Kinch initiated a consensual encounter with Defendant Salinas
27 for the purposes of asking him questions regarding his identity and his purpose in being in the area of
28 the Sierra Point Apartments.  The Court further finds that prior to the officer seeing the ice pick in

Defendant's chest pocket, the officers had not restrained Defendant's freedom or liberty of movement, such that the encounter could or should be viewed as a seizure not based on probable cause or reasonable suspicion of criminal activity.  Upon observing that Defendant was in possession of a concealed ice pick, Detective Kinch had probable cause to arrest Defendant Salinas for violation of NRS 202.350.1(d).  At that point, Detective Kinch also had reasonable suspicion that the Defendant was engaged in criminal activity or was armed with other weapons which justified the officer in attempting to physically restrain Defendant so that the officer could conduct a pat-down search.  Defendant's conduct in resisting the officer and fleeing from him, at which point the detective observed a firearm protruding from his overalls, only furthered the probable cause or reasonable suspicion which existed upon discovery of the concealed ice pick.

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant Ricardo Salinas' Motion to Suppress (#13) be DENIED.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 7th day of February, 2006.

_____
**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**